# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BRENNER MOTEL LLC, a Washington limited liability company, | No. 47813-7-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| BPO PROPERTIES LTD., A Canadian corporation, and FIFE SERVICES LLC a Delaware limited liability company, | |
| Appellants. | |

BJORGEN, C.J. — Lessees BPO Properties Ltd. and Fife Services LLC (collectively BPO) appeal the trial court's grant of summary judgment in favor of lessor Brenner Motel LLC, declaring that the rent floor provision of the parties' lease agreement sets a minimum rent obligation of $23,461.96 per month and awarding reasonable attorney fees and costs to Brenner Motel. BPO argues that the trial court erred in ruling that the rent floor provision was unambiguous and in failing to apply principles of contract construction in BPO's favor. We agree with BPO and hold that the rent floor provision is ambiguous. Disputed issues of material fact remain that will affect resolution of this ambiguity. Accordingly, we reverse the trial court's order of summary judgment and remand for further proceedings. We also reverse and vacate the trial court's award of reasonable attorney fees and costs in favor of Brenner Motel and decline to award Brenner Motel attorney fees on appeal.

## FACTS

In 1982, William Brenner approached Charles Woodke about leasing undeveloped property in Fife on which he intended to build a motel and restaurant complex. Brenner proposed a 60-year term with rent obligations tied in part to the gross revenue of the motel.

Woodke countered with a proposal to tie rent increases to the consumer price index (CPI). The parties eventually settled on a 52-year lease with an initial base rent amount of $5,700, annual rent increases of 5 percent, renegotiation of the rent amount after 30 years and every 5 years thereafter, and a rent floor establishing the minimum monthly rent obligation. The rent floor was based on the "figures and formula used for the first three hundred sixty (360) months of this lease." Clerk's Papers (CP) at 91.

In 1984, Brenner assigned his interest as lessee to Columbia River Service Corporation, which assigned it to BPO in 2000. Also in 2000, Woodke transferred his interest as lessor to Brenner Motel. In 2014, BPO assigned its interest to Fife Services, its subsidiary. However, BPO remained liable for rent obligations under the assigned lease.

In 2013, the 30-year rent renegotiation provision was triggered. At that time, the monthly rent obligation under the lease was $23,461.96. The parties attempted to negotiate a fair market rental value as required under the lease, but were unable to agree. Pursuant to a provision in the agreement, they submitted the issue to binding arbitration. The arbitrator determined that the fair market rental value for the property was $9,887.50 per month. Arbitration was limited to this issue and the arbitrator did not interpret the rent floor provision.

Brenner Motel brought an action in the trial court seeking a declaration that the rent floor provision set a minimum rent obligation equal to the rent paid in year 30, $23,461.96, which was substantially higher than the fair market rental value determined by the arbitrator. BPO counterclaimed that the rent floor clause in fact set a minimum rent obligation equal to the initial base rent, $5,700, which was substantially lower than the arbitrator's figure. Following discovery, Brenner Motel moved for summary judgment. The trial court ruled that the rent floor provision was unambiguous and that Brenner Motel's proposed interpretation was correct. The

trial court granted Brenner Motel's motion, issued its requested declaration, dismissed BPO's counterclaims, and awarded Brenner Motel attorney fees and costs as a the prevailing party.

BPO appeals the trial court's order and judgment.

ANALYSIS

BPO argues that the trial court erred in granting Brenner Motel's motion for summary judgment, because the rent floor provision is ambiguous and the applicable principles of contract construction favor BPO's interpretation. We agree that the provision is ambiguous, but we do not believe that the applicable principles of construction favor a particular interpretation without further factual development.

I. STANDARD OF REVIEW AND GENERAL PRINCIPLES OF CONTRACT INTERPRETATION

We review a trial court's decision to grant summary judgment de novo, performing the same inquiry as the trial court. *Lakey v. Puget Sound Energy*, *Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id*. We consider the evidence and all reasonable inferences drawn therefore in the light most favorable to the nonmoving party. *Id*. A genuine dispute regarding material facts exists if the evidence, viewed in this light, is sufficient for a reasonable finder of fact to return a verdict for the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).

Where contract interpretation does not require consideration of extrinsic evidence, it presents only an issue of law. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 711, 334 P.3d 116 (2014). However, where contract interpretation requires inferences from extrinsic evidence, it presents questions of fact. *Id*.

In interpreting contracts, the primary objective is to ascertain the parties' mutual intent at the time they executed the contract. *Viking Bank*, 183 Wn. App. at 712. To this end, we focus on the objective manifestations of intent in the contract itself, rather than the subjective intentions of the parties. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). We impute an objective intent corresponding to the reasonable meaning of the words used in the contract, as defined by their ordinary, usual, and popular meaning "unless the entirety of the agreement clearly demonstrates a contrary intent." *Id*. at 503-04. We also consider extrinsic evidence of the context in which the contract was drafted "'to determine the meaning of specific words and terms used,'" though "not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Viking Bank*, 183 Wn. App. at 713 (quoting *Hearst*, 154 Wn.2d at 503) (emphasis omitted).

If the provision remains ambiguous, we apply principles of contract construction in an effort to resolve the ambiguity. *Viking Bank*, 183 Wn. App. at 713. Under one such principle, we generally construe provisions against the party who drafted them. *Viking Bank*, 183 Wn. App. at 713. As our Supreme Court stated in *Berg v. Hudesman*, 115 Wn.2d 657, 677, 801 P.2d 222 (1990), "[d]epending on evidence adduced on remand, it may be proper for the court to construe ambiguous language against the drafter's client." Similarly, the *Restatement (Second) of Contracts* § 206 (1981) states: "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Comment a to this section adds that "so long as other factors are not decisive, there is substantial reason for preferring the meaning of the [nondrafting] party." Under another principle of construction, if a provision is

4

ambiguous, we will adopt the interpretation that is most reasonable and just over an interpretation making the provision unreasonable and imprudent. *Berg*, 115 Wn.2d at 672.

## II. AMBIGUITY

BPO argues that the rent floor provision is ambiguous and that the trial court erred by ruling that there was only one reasonable interpretation of it. We agree that the provision is ambiguous.

A contract provision is ambiguous if it is uncertain or subject to multiple reasonable interpretations after analyzing its plain language and the extrinsic evidence of context. *Viking Bank*, 183 Wn. App. at 713. However, a provision is not ambiguous merely because the parties propose differing interpretations; those interpretations must be reasonable. *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wn. App. 416, 421, 909 P.2d 1323 (1995).

BPO and Brenner Motel offer differing interpretations, demanding our determination whether both are reasonable under the circumstances. BPO contends that the reference to "the figures and formula used" sets the rent floor at the initial rent value, while Brenner Motel asserts that the phrase refers to the compounded amount derived by application of the 5 percent annual increase formula over the course of the first 30 years.

A.      Contract Language

"[W]hen interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Hearst*, 154 Wn.2d at 503-04. When reading words in a contract, we consider them in the context of the entire contract and give them their ordinary, usual, and popular meaning. *Id*. at 504. Although we do not treat plain meaning as necessarily dispositive of mutual intent, *Berg*, 115 Wn.2d at 678, where ordinary meaning considered in the context of the entire contract establishes only one reasonable

manifestation of intent, resort to extrinsic evidence is unnecessary and summary judgment is appropriate. *Dice v. City of Montesano*, 131 Wn. App. 675, 685, 128 P.3d 1253 (2006).

The language at issue in this case is that of the rent floor provision contained in subparagraph 3(d) of the lease agreement. That subparagraph states:

> Six (6) months prior to the end of the first three hundred sixty (360) months of the lease term and six (6) months prior to the end of each five (5) years of the lease term thereafter, Lessor and Lessee shall negotiate a fair market rental value for the leased premises as of that date. If the parties cannot agree on the fair rental value of the leased premises, then the matter shall be submitted to arbitration . . . . The rental so determined shall be the base rental to be paid for the next twelve (12) calendar months of the lease term, and said base rental shall be increased at the expiration of the first full twelve (12) calendar months and each year thereafter by five percent (5%) of the previous year's rental; provided, however, that the five percent (5%) increase shall not be applied to the base rental for the first twelve (12) calendar months after an adjustment in the base rental pursuant to this subparagraph (d); but *in no event shall the rents be less than the figures and formula used for the first three hundred sixty (360) months of this lease*.

CP at 90-91 (emphasis added). Subparagraph 3(a), in turn, supplies the only "figures and formula" applicable during the first 360 months of the lease:

> Lessee shall pay to Lessor a base rent at the rate of Five Thousand Seven Hundred Dollars ($5,700.00) per month for the first full twelve (12) calendar months of the lease term. At the expiration of the first twelve (12) calendar months of the lease term and every year thereafter, the base rent shall increase by five percent (5%) of the previous year's rent except for those years in which the rental is adjusted pursuant to subsection (d) of this paragraph. At the date of execution of this lease, Lessor shall pay to Lessee Eleven Thousand Four Hundred Dollars ($11,400.00), which payment shall be applied to the first two (2) full months' rent. If the lease term commences on any day other than the first day of the month, then the pro-rated portion of Five Thousand Seven Hundred Dollars ($5,700.00) for that month's rental shall be paid on the commencement day of the lease term.

CP at 90.

Giving the operative words their ordinary meanings when used as part of a calculation, the word "figures" refers to expressed numeric values, *see Webster's Third New International Dictionary* 848 (2002), and the word "formula" refers to a fixed method or established rule. *See*

6

WEBSTER'S, *supra*, at 894. The only relevant "figures" are the base rent amount ($5,700) and an initial two-month payment of $11,400 calculated using that base rent amount. The only applicable "formula" is the 5 percent annual increase applied in years 2 through 30 under subparagraph 3(a). CP at 90.[1]

Subparagraph 3(d) specifies that the rent may not be "less than the figures and formula used" to calculate the rent during the first 30 years. This could reasonably be interpreted, as BPO suggests, to mean that the rent may not be less than the lowest amount allowed through application of the formula to the figures during the first 30 years as provided under the contract terms, i.e., that the initial base rent ($5,700) in the "figures and formula" serves as the rent floor. However, it could also reasonably be interpreted, as Brenner Motel proposes, to mean that the rent may not be less than the amount arrived at by applying the formula to the figures *over* the first 30 years, i.e., the base rent value compounded and increased over the entire period. Based on ordinary meaning alone, neither interpretation is clearly favored given the awkward phrasing of the provision at issue.

Brenner Motel maintains that because the rent floor provision does not take effect until after the end of the first 30 years, the rent floor must be the rent calculated by compounding application of the 5 percent increase to the base rent amount over the course of that 30-year period. Brenner Motel argues that the rent floor could not apply during the first 30 years because the contract provides for a continuous increase in rents over that period. However, it does not follow that the rent obligation in subsequent years could not be less than that owed in year 30. The contractual context clearly establishes that the rent may be not be less than the original base

---

[1] The prorating provision could also be considered a formula, but it is not relevant to our inquiry here.

rent ($5,700), but the related contractual terms do not clarify whether the negotiated or arbitrated market value for year 31 could result in a rent obligation lower than that due in year 30. Moreover, the language used in the rent floor provision is temporally general, providing that "in no event" shall the rent be less than the rent floor amount. CP at 91. The contract terms do not establish, logically or linguistically, that the rent floor must equal the rent obligation in year 30, though neither do they rule out such an interpretation.

Brenner Motel further argues that interpreting the rent floor provision to call for a floor equal to the original base rent figure renders superfluous the word "formula" used in the provision. We must construe contract language in a manner that gives effect to the words used and does not render the chosen language meaningless. *MacLean Townhomes, L.L.C. v. Am. 1st Roofing & Builders Inc.*, 133 Wn. App. 828, 831, 138 P.3d 155 (2006). The contract language describes the figures and formula together in subparagraph 3(a) as a means of determining each year's rent under the contract. The formula operates to increase the rent amount every year after the first year by 5 percent of the previous year's rent. Properly applied, the formula produces an annual rent for year 1 equal to the original base rent—$5,700. Put another way, the lowest possible rent amount calculated using these "figures and formula" in conjunction is $5,700, which equates to the rent in year 1. This application of the formula to the figures results in a rent amount of $5,700 in year 1 and $23,461.98 in year 30.

In short, both parties' interpretations are consistent with the language of the rent floor provision. The language rules out neither interpretation, and the provision may reasonably be interpreted as each party suggests. As such, the contract language governing the rent floor is ambiguous.

B.      Extrinsic Evidence

Extrinsic evidence of the context in which a contractual provision was drafted may weigh upon the interpretation of the words used by the parties. *Hearst*, 154 Wn.2d at 502. Thus, it may help determine whether the provision at issue is ambiguous. We consider such evidence to the extent it illuminates the parties' mutual intent as to the meaning of the contract language. *Id*. This evidence may include the subject matter and objective of the contract, the circumstances surrounding the making of the contract, and the subsequent acts and conduct of the parties.[2] *Id*. Where more than one reasonable interpretation can be drawn in light of the extrinsic evidence, summary judgment is inappropriate. *See Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wn.2d 573, 582, 844 P.2d 428 (1993).

i.      Subject Matter and Objective

The subject matter and objective of the contract was a commercial lease for an intended motel and restaurant complex. The objective of the rent floor provision appears to have been to guarantee the lessor a certain rent amount regardless of market conditions. The parties do not dispute that the rent floor provision is designed to protect the lessor. The issue, rather, is how much rental value the parties intended to guarantee. Rent floors of $5,700 and $23,461.98 both protect the landlord; the latter is simply far more protective. Thus, the subject matter and objective of the contract as a whole and the rent floor provision in particular lend no real weight to our interpretive analysis.

---

[2] Our Supreme Court in *Hearst* also noted that consideration of extrinsic evidence may include "the reasonableness of respective interpretations urged by the parties." 154 Wn.2d at 502. However, this analysis is effectively duplicative of the other analyses where, as here, the available extrinsic evidence is only circumstantial, involving reasonable inferences from the subject matter and objectives of the parties, the circumstances surrounding the making of the contract, and the parties' subsequent conduct. *See Berg*, 115 Wn.2d at 668.

ii.        Circumstances Surrounding the Making of the Contract

The circumstances surrounding the making of the contract provide limited insight into the parties' intended meaning of "figures and formula" as used in the rent floor clause. Brenner initially proposed a rent value tied to the commercial venture's revenues. In the course of subsequent negotiations, the parties added the 5 percent annual rent increase and the fair market value adjustment provisions.[3] Woodke then added the rent floor provision.[4] That proposal indicates that Woodke believed the fair market value in year 30 might not exceed the amount calculated by sequential 5 percent increases. However, it does not indicate how the parties intended to allocate the attendant risk. BPO's proposed interpretation places that risk almost entirely on the lessor, while Brenner Motel's interpretation allocates the risk entirely to the lessee. Viewed in the light most favorable to BPO, this circumstantial evidence does not resolve the ambiguity in the rent floor language.

---

[3] BPO moved to strike portions of Woodke's declaration related to the negotiations with Brenner. The trial court granted the motion. BPO argues on appeal that we must not consider the stricken portions because Brenner Motel has not cross-appealed the trial court's order to strike, and has waived any challenges on appeal by failing to argue for admissibility. However, we need not determine whether we may consider this evidence because it does not affect our decision on appeal.

The stricken portions relate to the course of negotiations between Brenner and Woodke, Brenner's financing schedule, and Woodke's subjective opinions at the time of drafting. Even if we considered this evidence, under the standard we apply when reviewing summary judgments we would view the evidence in the light most favorable to BPO and draw all reasonable inferences in BPO's favor. So viewed, the stricken evidence does not help to resolve the ambiguity in the rent floor provision.

[4] Woodke's statement that he proposed the rent floor provision was among the information stricken from his declaration. However, Woodke stated that he added the same provision in his unchallenged deposition testimony. Therefore, the trial court had before it evidence that Woodke drafted the rent floor provision. Viewed in the light most favorable to BPO, we must credit this unchallenged evidence for purposes of reviewing summary judgment.

BPO argues that Woodke's agreement to the "figures and formula" phrasing, despite having calculated the specific amount that would be due under the contract in year 30, indicates that he believed the rent floor was not equal to the year 30 rent obligation. As BPO claims, the record shows that Woodke created a rent schedule that showed this amount. However, this fact supports neither party's interpretation, as the base rent value ($5,700) that BPO interprets to be the rent floor was also clearly known to both parties at time of execution. For whatever reason, the parties chose not to specify either figure in the rent floor provision, despite having the ability to do so.[5]

Brenner Motel argues that the contract must be interpreted in light of the market conditions at the time of its execution. That period was one of high inflation, with the CPI increasing by more than 5 percent in the preceding nine years. This would indicate that the parties considered it at least possible that a 5 percent annual increase in rent amount would not exceed inflation over the course of the lease. However, this tells us nothing about whether the parties agreed that the fair market value adjustment could benefit only the lessor, and that the lessee therefore was to bear the entire risk of adverse market conditions.[6]

---

[5] Woodke's schedule includes rent amounts for years 31 through 52, with the amount increasing each year. One could reasonably infer from this that Woodke created the schedule before the parties agreed to renegotiate or arbitrate rent in year 30, that Woodke simply assumed the property's fair market value would exceed the rent floor in year 30, or that Woodke believed the schedule represented the minimum rent pursuant to the rent floor clause. Viewing the evidence in the light most favorable to BPO for purposes of summary judgment, we decline to draw the latter inference. The schedule conclusively shows only that Woodke was aware of the year 30 rent amount calculated using the figures and formula of subparagraph 3(a).

[6] Brenner Motel asserts that it would be absurd to conclude that the rent floor is equal to the initial rent amount because "[c]ontinuous deflation over a period of thirty years is unprecedented and completely unrealistic." Br. of Resp't at 18-19. Although such a low rent floor may have seemed to give the lessor relatively little protection in the inflationary climate that preceded its execution, it is consistent with the purpose of the rent floor provision—to limit the impact of downward rent pressures created by adverse market conditions to a level acceptable to both

iii.     Subsequent Acts and Conduct of the Parties

BPO argues that Brenner Motel's miscalculation of the rent obligation in year 30 shows that "the calculations are ambiguous" under the contract. Br. of Appellant at 34. However, the miscalculation was due to BPO's clerical error and resulting overpayment, which Brenner Motel apparently accepted without recalculation. Nothing in the record indicates that the miscalculation was in any way related to ambiguous language in the rent floor clause. Even viewed in the light most favorable to BPO, this evidence is irrelevant to our interpretive analysis.

iv.     Conclusion

Viewed through the lens of our summary judgment standard, the available extrinsic evidence does not clarify which of the parties' proposed interpretations matches the contracting parties' mutual intent. The most that can be gleaned from the evidence is that the parties likely intended to allocate the risk of future market conditions and that Woodke was unwilling to assume the unlimited risk that would arise from a fair market value adjustment without a rent floor. Both parties' proposed interpretations of the rent floor provision are consistent with this evidence. The parties disagree only as to the extent of risk allocated to the lessee, i.e., the height of the rent floor. Therefore, the extrinsic evidence before us viewed in the light most favorable to BPO does not resolve the ambiguity in the rent floor provision. Accordingly, we hold that the trial court erred by ruling that the provision was unambiguous.[7]

_____

parties. The parties certainly could have set that level at the initial rent amount for any of a variety of reasons. Brenner Motel's argument to the contrary assumes that Woodke would not have agreed under any circumstances to a provision that could have increased the risk to him. Even if this assumption could be characterized as a reasonable inference from the evidence, on review of summary judgment we may not draw such an inference in the moving party's favor.

[7] Our holding in large part is the result of our posture on review of the trial court's summary judgment order. Following trial, extrinsic evidence may well resolve the ambiguity in the rent floor provision.

## III. RULES OF CONTRACT CONSTRUCTION

Because the rent floor provision is ambiguous, the trial court should have applied principles of contract construction in an attempt to resolve the ambiguity. The principles relevant to this appeal are construction against the drafter and construction to avoid unreasonable and unjust interpretations. BPO argues that both principles weighed against granting summary judgment to Brenner Motel.

### A. Construction Against the Drafter

We will generally construe an ambiguous provision against its drafter. *Viking Bank*, 183 Wn. App. at 713. However, we can only do so if the available extrinsic evidence establishes which party drafted the provision and does not show that the parties drafted it together. *Id*.

BPO argues that because Woodke drafted the rent floor provision, we should construe it against his successors in interest. Brenner Motel contends that the extrinsic evidence shows only that Woodke and Brenner both participated in drafting the lease agreement and does not show who drafted the rent floor provision.

The extrinsic evidence available to us on review of summary judgment favors BPO's position. Although Woodke's declaration does not clarify who drafted the rent floor provision, his deposition testimony does. When asked who added the language of the rent floor provision, Woodke responded, "I did." CP at 299. Woodke also stated that he "requested [the rent floor provision] be inserted into the lease." CP at 299. Viewed as credible for purposes of summary judgment, this evidence shows that Woodke, not Brenner, drafted the rent floor provision.

The principle of construction against the drafter is important, but it is not alone conclusive. *See Viking Bank*, 183 Wn. App. at 713; *Berg*, 115 Wn.2d at 677; RESTATEMENT

(SECOND) OF CONTRACTS § 206 cmt. a. On the available evidence, that principle favors BPO's position.

B.      Construction to Avoid Unreasonable and Unjust Interpretation

"'When a provision is subject to two possible constructions, one of which would make the contract unreasonable and imprudent and the other of which would make it reasonable and just, we will adopt the latter interpretation.'" *Berg*, 115 Wn.2d at 672 (quoting *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 837, 726 P.2d 8 (1986)).

BPO argues that it is most reasonable and just to adopt its interpretation, since it would produce a rent obligation equal to the arbitrated fair market rental value. The extrinsic evidence shows that Woodke proposed the fair market rental adjustment and rent floor provisions to limit his risk in the event of runaway inflation that outpaced the annual 5 percent increase. That inflation, though, did not occur. The resulting fair market value at year 30, well beneath the rent owed in year 30, suggests it is most reasonable and just to adopt BPO's interpretation, setting a rent floor equal to the base rent ($5,700) and therefore setting the current rent obligation at the amount determined in arbitration to be the current fair market value ($9,887.50). On the other hand, adoption of a rent floor reflecting 30 year old market conditions may not be a just or reasonable view of the parties' intentions at execution of the lease. To the extent the lower floor would undermine the parties' agreed-upon allocation of the risk of then-uncertain market conditions, it would unreasonably and unjustly favor BPO. Given the available evidence, we cannot say that this principle clearly favors either party.

IV.  CONCLUSION REGARDING SUMMARY JUDGMENT

Because we hold that the rent floor provision is ambiguous in light of the available extrinsic evidence viewed most favorably to BPO, we reverse the trial court's order of summary

judgment and remand to proceed with the declaratory judgment action. On remand, the parties may present evidence on the drafting of the lease agreement and other contextual circumstances relevant to interpretation of the rent floor provision, not limited to evidence already submitted on summary judgment. The rent floor provision shall be interpreted in light of this evidence and the relevant principles of construction, consistently with this opinion.

## V. ATTORNEY FEES AT TRIAL COURT

BPO argues that the trial court erred by awarding Brenner Motel reasonable attorney fees and costs below. We agree.

The trial court awarded Brenner Motel reasonable attorney fees and costs as the prevailing party. However, we hold that the trial court erred in granting summary judgment to Brenner Motel and reverse the summary judgment order. Accordingly, Brenner Motel did not prevail in the trial court and was not entitled to an award for attorney fees and costs. We reverse and vacate the award of reasonable attorney fees and costs in favor of Brenner Motel.

## VI. ATTORNEY FEES ON APPEAL

In its response brief, Brenner Motel requests an award of attorney fees on appeal under the terms of the lease agreement. We may award reasonable attorney fees to a party if applicable law authorizes such an award and the party has properly requested it in its opening brief. RAP 18.1. Section 25 of the lease agreement authorizes such an award, providing that in any action to enforce the terms of the lease the prevailing party is entitled to an award for reasonable attorney fees, costs, and expenses. However, with our resolution of this appeal, neither party can fairly be said to have prevailed on appeal. Therefore, Brenner Motel is not entitled to attorney fees under the lease agreement on this appeal.

CONCLUSION

We reverse the trial court's order of summary judgment and remand to proceed with the declaratory judgment action consistently with this opinion. We also reverse and vacate the award of reasonable attorney fees and costs in favor of Brenner Motel and decline to award Brenner Motel attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, C.J.
BJORGEN, J.

We concur:

_____
JOHANSON, J.

_____
MAXA, J.